IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JERRY A. HANN, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL NO. 3:12-CV-02222 |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | (Judge Kane) |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant | : | |

## <u>MEMORANDUM</u>

Plaintiff Jerry A. Hann has filed this action seeking review of a decision of

the Commissioner of Social Security ("Commissioner") denying Hann's claim for

social security disability insurance benefits.  (Doc. 1).

Disability insurance benefits are paid to an individual if that individual is

disabled and "insured," that is, the individual has worked long enough and paid

social security taxes.  The last date that a claimant meets the requirements of being

insured is commonly referred to as the "date last insured."  It is undisputed that

Hann met the insured status requirements of the Social Security Act through

December 31, 2010.  Tr. 85, 278.  In order to establish entitlement to disability

insurance benefits Hann was required to establish that he suffered from a disability

on or before that date.  42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R.

§404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

I.     **BACKGROUND**

Hann protectively filed his application for disability insurance benefits on

July 13, 2006, claiming that he became disabled on September 16, 2005.  Tr. 85,

250.  The ALJ found that Hann suffered from several medically determinable

impairments, including degenerative disc disease of the lumbar spine with

radiculopathy, degenerative joint disease of the right ankle, hypertension,

depression, and anxiety.  Tr. 25.  The record reflects that Hann had also been

diagnosed with numerous other impairments, including: lumbar

spondylosis/osteoarthritis, degenerative joint disease of the knees, a right foot

stress fracture, right ankle peripheral neuropathy and radiculopathy, peroneal

tendinitis of the right foot, a lumbar disc herniation, and right rotator cuff

tendinitis.  Tr. 432, 521, 609, 683, 708, 713, 736.  On September 14, 2006, Hann's

application was initially denied by the Bureau of Disability Determination. Tr. 152.

On October 1, 2006, Hann requested a hearing before an administrative law

judge ("ALJ").  Tr. 157.  The ALJ conducted a hearing on October 11, 2007 and

again on November 24, 2009;[1] Hann was represented by counsel at both hearings.

---

[1] An initial ruling was issued by the ALJ dated October 22, 2007.  Tr. 140-46.  On July 24, 2009,
the Appeals Counsel overturned the initial decision and remanded the case back to the ALJ for
further consideration. Tr. 148.

Tr. 39-81, 84-135.   On December 22, 2009, the ALJ issued a decision denying Hann's application.  Tr. 23-31.  On September 13, 2012, the Appeals Council declined to grant review.  Tr. 1.  Hann filed a complaint before this Court on November 7, 2012. (Doc. 1).  Supporting and opposing briefs were submitted and this case became ripe for disposition on April 29, 2013, when Hann filed a reply brief. (Docs. 8, 10, 12).

Hann appeals the ALJ's determination on two grounds: (1) the ALJ improperly evaluated the various medical opinions, and (2) the ALJ's credibility determination was not supported by substantial evidence. (Doc. 8).  For the reasons set forth below, this case is remanded to the Commissioner for further proceedings.

II.   **STATEMENT OF RELEVANT FACTS**

Hann is 56 years of age,[2] has a ninth grade education, and is able to read, write, speak, and understand the English language. Tr.  65-66, 93.  Hann's past relevant work includes work as a machine operator II, which is classified as medium, semi-skilled work, and as a hand packager, which is medium, unskilled work.  Tr. 68-69, 403-04.  Hann also worked as a material handler, which is classified as heavy, semi-skilled work and as a machine cleaner, which is medium, unskilled work.  Tr. 69-71, 406-07.

---

[2] Hann was born February 5, 1958. Tr. 87.  Thus, at the time of his application on July 13, 2006 he was 48 years old and was considered a "younger person" under social security regulations. 20 C.F.R. § 404.1563(c).  However, as of February 6, 2008 when Hann turned 50, he was considered "closely approaching advanced age."  20 C.F.R. § 404.1563(d).

## A.    Physical Impairments[3]

Hann's relevant medical history begins in 2004, when x-rays revealed early degenerative joint disease in both of Hann's knees.  Tr. 521, 561.  In early 2004, Hann sustained a fall in his home with no immediate consequences.  Tr. 647.  However, as time progressed Hann began experiencing increasing pain in his low back that later began radiating into his lower extremities.  Id.  Consequently, on August 20, 2004 Hann underwent an MRI scan of his lumbar spine; this MRI revealed mild to moderate degenerative disc disease greatest at the L5-S1 level, moderate bilateral foraminal narrowing at the L5 level, and a very small central disc herniation at the L5 level.  Tr. 560.  In November 2004, Hann began attending physical therapy sessions with Clint Ogden, P.T. to treat ankle and low back pain.  Tr. 482.  By December 2004, an increase in Neurontin had significantly decreased Hann's symptoms, and thus physical therapy was discontinued.  Id.

Despite Hann's temporary improvement, he continued to have regular appointments with his treating physician, Mark Yurek, M.D.  Tr. 510-12.  On January 18, 2005, Dr. Yurek first diagnosed Hann with lumbar radiculopathy.[4]  Tr.

---

[3] Some of Hann's medical records address his medically determinable impairments of depression and anxiety.  Hann has challenged the ALJ's findings relating to his mental impairments.  (Doc. 8).  However, because remand is required for other issues, Hann's mental impairments will not be addressed.  Consequently, discussion of medical records relating to Hann's mental impairments is omitted from the relevant facts.

[4] "Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord. They carry signals to the rest of the body at each level along the spine. The nerve roots exit through holes (foramen) in the bone

510.  By May 2005, Dr. Yurek believed that Hann's radiculopathy had worsened and consequently ordered an MRI of Hann's lumbar spine.  Tr. 509.  This MRI demonstrated facet degeneration at the L4-L5 level with facet fluid presence, but otherwise the findings were similar to those of the 2004 MRI.  Tr. 506, 548.  A nerve conduction study and EMG demonstrated chronic denervation/neuropathy at the L5-S1 level.  Tr. 505, 506, 555.

On September 19, 2005, Dr. Yurek noted that Neurontin was no longer helping to control the pain associated with Hann's neuropathy.  Tr. 507.  By October 2005, Hann was able to walk to his mailbox (approximately ¼ mile) but had difficulty walking back to his home due to his back pain.  Tr. 504.  On November 21, 2005, Hann reported that his pain was worsening and that, after shopping for fifteen minutes, he had to sit and rest due to pain.  Id.

On November 23, 2005, Hann presented to Richard Tenser, M.D. for a back pain evaluation.  Tr. 589-91.  Hann complained of low back pain that extended into his legs, leg weakness, numbness in his toes, swelling in his ankles and feet, and "lesser symptoms" in his neck, hands, and arms.  Tr. 589-90.  Dr. Tenser found no joint swelling, rash, or edema in Hann's extremities, and no tenderness with deep palpation and percussion on any portion of Hann's spine.  Tr. 590.  There was no

---

of spine on the left and the right. Radiculopathy can be the result of a disc herniation or an injury causing foraminal impingement of an exiting nerve (the narrowing of the channel through which a nerve root passes)." Zerbe v. Colvin, 3:12-CV-01831, 2014 WL 2892389, at n.6 (M.D. Pa. June 26, 2014), (quoting Shiner v. Colvin, 3:12–CV–01683, 2014 WL 1767126, at n.28 (M.D. Pa. May 2, 2014)).

atrophy, Hann's gait was intact, and his strength was intact throughout.  Id.

However, Hann did have decreased pin sensation over both feet.  Id.  Dr. Tenser

concluded that there was no evidence of root disease or disc disease.  Id.  At Dr.

Tenser's recommendation, another lumbar spine MRI was conducted on December

12, 2005.  Tr. 547.  This MRI revealed mild bulging at the L4-5 level, mild, early

degenerative changes are the L5-S1 level, and facet fluid at the L5-S1 level.  Id.

The technician noted that the facet fluid "may contribute to low back pain . . ."  Id.

On February 7, 2006, Hann presented to Ewa Malinowski, M.D. for a pain

management evaluation.  Tr. 647.  Hann complained that he experienced constant

pain in his lower back; at rest his pain was a two out of ten, but with activity his

pain level increased to ten out of ten.  Id.  Hann also complained that his knees hurt

with walking.  Id.  Hann reported that a "[r]elieving factor is medications, but

minimally," and denied any improvement in symptoms with rest.  Id.  Hann also

stated that his right lower extremity was weaker and, consequently, he had fallen at

least three times after his right leg "gave away."  Id.  Dr. Malinowski observed that

Hann had an antalgic gait, diminished range of motion in the lumbar spine, and

diminished skin sensation over his thighs and calves.  Tr. 648.  However, Hann did

have 5/5 strength throughout and a negative straight leg test bilaterally.  Id.  Dr.

Malinowski diagnosed Hann with lumbar spondylosis.  Id.

On February 27, 2006, Dr. Malinowski treated Hann with the first in a series of lumbar epidural steroid injections. Tr. 428, 434. This injection provided Hann with "good pain relief for a short period of time." Tr. 432. On March 29, 2006 Hann reported that his pain was a two to five out of ten while at rest, with an increase to seven out of ten after activity. Id. At this appointment, Hann was ambulating without difficulty and had a negative straight leg test, although his lumbar range of motion was still diminished. Id. Hann received a second epidural injection, with an increased dose of medication, on April 12, 2006. Tr. 428, 431. This injection relieved most of Hann's pain; his pain level was a zero with rest, and increased to four with activity. Tr. 430. Hann reported that he had increased his activities of daily living to seventy percent of their pre-injury level, and he was able to ambulate without difficulty. Id.

On April 11, 2006, Esther Oney, a colleague of Dr. Yurek, wrote a letter in support of Hann's unemployment application, wherein Ms. Oney opined that Hann was capable of working so long as he did not lift more than twenty pounds. Tr. 588. Hann would also need to alternate between sitting and standing every two hours and must refrain from excessive bending and squatting. Id.

On May 28, 2006, Hann presented to the emergency room complaining of chronic low back pain and swelling in his feet and ankles. Tr. 438. The emergency room staff noted that Hann was suffering from edema in both feet, both

ankles, and both shins.  Tr. 438.  On June 11, 2006, Hann returned to the

emergency room complaining of increased back pain after falling down.  Tr. 436.

The emergency room staff noted that Hann was "chronically unsteady," and found

diffuse tenderness in his lumber spine region, although Hann had a negative

straight leg test.  Id.

Dr. Malinowski provided a third epidural injection on June 12, 2006, again

with an increased dose of medication.  Tr. 428.  This injection again provided

significant relief, although Hann's pain still ranged anywhere from zero to seven

out of ten on any given day.  Tr. 693.  On July 12, 2006, Hann presented to his

orthopedic doctor, Michael Husar D.P.M., for an evaluation of his ankle and foot.

Tr. 606.  Dr. Husar noted some limited range of motion in Hann's ankle, as well as

edema in his foot and ankle.  Id.  At a second appointment one week later, Dr.

Husar again noted a decreased range of motion, edema, and found ankle pain with

palpation.  Tr. 608.  Hann complained that no medications were successful in

decreasing his ankle pain.  Id.  Dr. Husar diagnosed Hann with a right ankle sprain,

talar dome lesion, and a stress fracture.  Id.  On July 26, 2006, Dr. Husar reviewed

an MRI of Hann's right ankle and diagnosed Hann with peripheral neuropathy and

radiculopathy.  Tr. 609.

On July 27, 2006, Hann returned to Dr. Malinowski for a fourth epidural

injection.  Tr. 429.  This injection afforded Hann "good pain relief for several

weeks." Tr. 691.  Hann reported that his pain relief was approximately seventy

percent, and his pain was reduced to, at most, five out of ten with activity.  Id.

Despite this pain reduction, at an August 28, 2006 appointment, Hann still had a

decreased range of motion in his lumbar spine and had tenderness over his left

paraspinal muscle.  Id.  Hann underwent three more epidural injections throughout

2006,[5] with each injection providing significant, albeit temporary, relief.[6]  Tr. 676.

On September 13, 2006, Hann returned to Dr. Husar with continuing ankle

and foot issues.  Tr. 707.  On October 27, 2006, Dr. Husar diagnosed Hann with

osteoarthritis and peroneal tendinitis of the right foot with a possible ligamentus

injury.  Tr. 708.  At Hann's last appointment with Dr. Husar on November 3, 2006,

Dr. Husar fitted Hann for a Colorado brace.  Tr. 710.  Dr. Husar diagnosed Hann

with osteoarthritis and tenosynovitis in the right ankle.  Id.

On November 28, 2006, Hann returned to Dr. Malinowski complaining that

his low back pain had returned.  Tr. 683.  Hann was having difficulty ambulating

and had a limited range of motion in all directions, although his straight leg test

was negative.  Id.  Dr. Malinowski diagnosed Hann with lumbar spondylosis.[7]  Id.

---

[5] Hann's last epidural injection occurred on November 21, 2006.  R. 676.  Although the record
does not reflect why Hann discontinued epidural injections, Dr. Yurek implies that the epidural
injections eventually lost their effectiveness.  Tr. 759.

[6] During this time, Hann also participated in five physical therapy sessions with Bruce Hitchens,
P.T.  Tr. 653.

[7] Spondylosis "is a degenerative disorder that may cause loss of normal spinal structure and
function. . . Sitting for prolonged periods of time may cause pain and other symptoms due to
pressure on the lumbar vertebrae. Repetitive movements such as lifting and bending (eg, manual

Since conservative treatments had failed, Dr. Malinowski scheduled a diskogram to "rule out diskogenic pathology as the source of [Hann's] severe pain." Id. On December 7, 2006, Dr. Malinowski preformed a diskogram on Hann's cervical spine at the L3-4, L4-5, and L5-S1 levels. Tr. 681. The diskogram produced concordant pain at the L5-S1 level, and revealed an irregular disk appearance. Id. A December 7, 2006 CT scan revealed a probable herniation at the L5-S1 level. Tr. 630-31, 679.

On December 14, 2006, Hann presented to V.A.R. Kumar, M.D. for an examination. Tr. 671-71. Dr. Kumar noted that Hann was able to ambulate on his toes, but he had difficulty ambulating on his heels. Tr. 670. Hann's motor strength was intact; he had normal sensation and no atrophy. Id. However, his straight leg test was positive for pain at sixty degrees and he had diffuse pain at the L5 region. Id. Dr. Kumar believed that Hann was suffering from arthritic changes in his back, rather than a disc problem. Tr. 671.

In February 2007, Hann presented to Kevin Clawson, D.O. for treatment of his low back pain. Tr. 640-41, 713. Dr. Clawson observed that Hann had a stiff gait and had "moderate" limitations in his lumbar spine range of motion. Tr. 713. Hann also had tenderness in his lumbar spine, and his straight leg test was positive for pain at sixty degrees. Id. Dr. Clawson noted shoulder tenderness and a limited

---

labor) may increase pain." SpineUniverse.com, Spondylosis, *available at* http://www.spineuniverse.com/conditions/spondylosis/spondylosis (last visited July 14, 2014).

range of motion in Hann's right rotator cuff.  Id.  In addition to degenerative disc

changes at multiple levels of Hann's lumbar spine, Dr. Clawson also diagnosed

Hann with osteoarthritic changes at both of his knees and feet.  Id.  Dr. Clawson

further diagnosed Hann with right rotator cuff tendinitis.  Id.  At Hann's next two

appointments with Dr. Clawson, he continued to exhibit pain in his straight leg

tests and walked with a stiff gait.  Tr. 639, 714.

A December 12, 2007 MRI of Hann's lumbar spine revealed a small disc

herniation at the L4-5 level, some spondylolisthesis, and disc dehydration at the

L5-S1 level.  Tr. 736.  No nerve root compression or spinal stenosis was

demonstrated.  Id.  X-rays revealed no significant abnormalities in Hann's spine,

hips or knees.  Tr. 737.  Tests conducted on March 25, 2008 demonstrated minor

osteophyte[8] formations in Hann's lumbar spine, as well as mild scoliosis.  Tr. 748.

On April 11, 2008, Dr. Yurek opined that Hann was "completely disabled

from competitive employment."  Tr. 759.  Dr. Yurek stated that Hann had two

EMG/nerve conduction studies performed; the first showed chronic

denervation/neuropathy at the L5-S1 level, while the second did not.[9]  Tr. 758-59.

Dr. Yurek stated that both he and the neurologist who performed the studies

---

[8] Osteophytes, also referred to as bone spurs, are "bony projections that develop along the edges of bones." Mayoclinic.com, Bone Spurs Definition, *available at* http://www.mayoclinic.org/diseasesconditions/bone–spurs/basics/definition/con–20024478 (last visited July 14, 2014).

[9] The second study is not contained within the administrative record; the only evidence of its existence is Dr. Yurek's letter.

believed that the first study was correct, and Hann was suffering from neuropathy. Tr. 759.  Dr. Yurek noted that epidural injections "seemed to help at first, but no total relief was seen."  Id.  Dr. Yurek stated that Hann's lumbar degenerative joint disease was not responding to pain management, and Hann was not a surgical candidate.  Id.  Given these facts, Dr. Yurek felt that Hann's "prognosis for recovery or improvement [was] guarded to poor."  Id.

### B.   Residual Functional Capacity Assessments

On August 22, 2006, Dr. Husar opined that, based solely on Hann's orthopedic impairments, Hann was capable of occasionally lifting and carrying up to one hundred pounds, or up to twenty-five pounds frequently.  Tr. 604.  Dr. Husar also believed that Hann could only occasionally stoop, crouch, balance, and climb.  Tr. 605.

On September 6, 2006, Michael Brown, D.O. completed a physical residual functional capacity assessment[10] in which he opined that Hann was capable of occasionally lifting or carrying up to twenty pounds, and could frequently lift up to ten pounds.  Tr. 611.  Dr. Brown opined that Hann could never climb ropes or scaffolds, but could occasionally climb ramps, stairs, or ladder, and could occasionally balance, stoop, kneel, crouch, or crawl.  Tr. 612.

---

[10] The ALJ found that this opinion was outdated, and did not assign any weight to the opinion. Tr. 29.

On March 25, 2008, Mark Holencik, D.O., examined Hann and completed a residual functional capacity assessment.  Tr. 742-47.  Dr. Holencik noted that Hann had paraspinal muscle spasms and experienced diffuse low back pain when flexing at the waist and bringing his fingertips to his knees.  Tr. 743.  Dr. Holencik observed that Hann had to use the palms of his hands to climb up his anterior thighs in order to restore an upright position.  Id.  Hann was only able to extend to ten degrees before experiencing midline low back pain, and had a positive straight leg test in both the seated and supine positions.  Id.  Dr. Holencik noted that Hann was able to heel to toe walk and had a full range of motion in his ankles; however, he did have tenderness in his right ankle medially and laterally and he experienced pain during the drawer test.  Id.

Dr. Holencik noted that Hann was "extremely apprehensive" to allow either of his shoulders into either abduction or external rotation.  Id.  Dr. Holencik opined that this could be the result of "an occult instability or some type of capsular insufficiency and/or labral tear."  Id.  Dr. Holencik diagnosed Hann with right sciatic radiculopathy and probable cervical spondylosis.  Tr. 745.  Dr. Holencik believed that Hann did "not try to amplify his symptoms," and believed that Hann had "minimal, if any, skills compatible with meaningful desk or sedentary employment."  Id.

 Dr. Holencik opined that Hann was capable of occasionally lifting up to ten pounds, and frequently lifting two to three pounds.  Tr. 746.  He believed that Hann could walk or stand for three to four hours in an eight hour workday, and could sit for four to six hours.  Id.  Dr. Holencik also believed that Hann was limited in his ability to push or pull with either his upper or lower extremities.  Id.  He believed that Hann should never balance or climb, but may occasionally bend, stoop, kneel, or crouch.  Tr. 747.  Dr. Holencik also opined that Hann's ability to reach was limited by his neck and shoulder impairments, and he should not work from heights due to his poor balance.  Id.

 On April 23, 2009, Dr. Yurek completed a residual functional capacity assessment.  Tr. 750-57.  Dr. Yurek stated that much of Hann's pain back, hip, and leg pain was caused by multi-level lumbar degenerative joint disease, L5-S1 chronic denervation, and a small lumbar disc herniation.  Tr. 750-51.  Dr. Yurek opined that Hann was capable of sitting for up to two hours and standing or walking for up to one hour during an eight hour workday.  Tr. 752.  Furthermore, Hann could only sit for fifteen to thirty minutes before he would need to stand up; he would need to stand for fifteen to thirty minutes before he could sit down again.  Tr. 752-53.  Dr. Yurek further opined that Hann was only able to occasionally lift and carry up to five pounds.  Tr. 753.  In Hann's right and left upper extremities, he had marked limitations in his ability to reach, to grasp, to turn, or to twist

14

objects.  Tr. 753-54.  Hann was moderately limited in ability to use his fingers or hands for fine manipulation.  Tr. 754.

Dr. Yurek believed that Hann's pain, fatigue, and other symptoms would constantly interfere with his attention and concentration.  Id.  Dr. Yurek opined that Hann was capable of tolerating low work stress.  Id.  Hann must avoid wetness and temperature extremes, and should avoid pushing, pulling, kneeling, bending, or stooping.  Tr. 756.  Dr. Yurek stated that Hann was not a malingerer, and his symptoms would likely increase if he returned to work.  Tr. 754.

On June 10, 2008 Candelaria Legaspi, M.D., a state agency consultant, completed a physical residual functional capacity assessment.  Tr. 760-66.  Based on a review of Hann's medical records, Dr. Legaspi diagnosed Hann with obesity and a small lumbar disc herniation at the L4-5 level.  Tr. 760.  Dr. Legaspi opined that Hann was capable of occasionally lifting and carrying up to twenty pounds, and could frequently lift or carry up to ten pounds.  Tr. 761.  Otherwise, Dr. Legaspi did not believe that Hann's impairments limited him in any way.  Tr. 761-63.  Dr. Legaspi based this opinion on a review of the MRI and x-ray studies conducted in December 2006, Dr. Kumar's examination notes from December 2006, Dr. Holencik's residual functional capacity assessment, and Hann's self-reported activities of daily living.  Tr. 765-66.

At Hann's administrative hearing on November 24, 2009, Garret Dickson, M.D. was called to give medical testimony.  Tr. 42.  After a review of Hann's medical records, Dr. Dickson diagnosed Hann with lumbar degenerative disc disease with mild lumbar radiculopathy.[11]  Tr. 44.  Dr. Dickson noted that Hann's pain was "somewhat ameliorated" by medication.[12]  Tr. 46.  Dr. Dickson stated that most of the other functional capacity assessments were consistent with medical record, with the exception of Dr. Yurek's assessment which was "a little too restrictive."  Tr. 48-49.  Dr. Dickson also believed that Dr. Legaspi's opinion was "a little bit high" compared to other assessments.  Tr. 49.

Dr. Dickson further testified that, while Hann's complaints and symptoms were consistent throughout the record, he believed these symptoms "were probably not born out" by the objective medical findings.  Tr. 52.  Dr. Dickson opined that Hann was capable of walking and standing for two to three hours in an eight hour workday and sitting for six hours in a workday.  Tr. 54.  Hann could never climb ropes, ladders, scaffolding, or poles, but could occasionally climb stairs.  Id.  Dr. Dickson believed that Hann should avoid stooping, bending, crouching, squatting, or crawling, but could occasionally kneel.  Tr. 54-55.

---

[11] Dr. Dickson did not believe any other medically determinable impairment existed, although he did note that Hann had a "foot and ankle problem . . ."  Tr. 51.

[12] Dr. Dickson stated that pain management was variable, and every patient has a different reaction to medications.  Tr. 46.  Thus, while Dr. Dickson believed the pain relief that Hann obtained was less than he would have expected, he "would not expect a full relief of pain with medication."  Id.

Dr. Dickson also believed that Hann could only occasionally reach overhead bilaterally, occasionally work with vibrating objects or surfaces, and only occasionally work around fast moving machinery.  Tr. 55.  He believed that Hann should completely avoid working in high, exposed places.  Id.  Dr. Dickson opined that Hann must be allowed to alternate between sitting and standing at his discretion throughout the workday.  Tr. 56.  Finally, Dr. Dickson limited Hann to occasionally lifting or carrying up to ten pounds, and frequently lifting or carrying two to three pounds.  Tr. 58.

### C.    The Administrative Hearing

On October 22, 2007, Hann's first administrative hearing was conducted. Tr. 86-119.  At that hearing, Hann testified that, after his alleged date of disability, he collected unemployment compensation for approximately six months.  Tr. 90. Hann testified that he had received epidural injections from Dr. Malinowski for some time, but he discontinued the injections because Dr. Malinowski had done "all she could do."  Tr. 102-03.  He further testified that Dr. Malinowski believed that surgery would have done "more harm than good."  Tr. 104.  Hann stated that his doctors had begun to wean him off of narcotic medications; since then, his pain had worsened.  Tr. 105-06.  Hann's right ankle pain continued to be problematic, and he needed to use an ankle brace approximately three times per week.  Tr. 115, 118.  The most that Hann could comfortably lift was five to ten pounds.  Tr. 117.

17

Hann stated that his back pain prohibited him from sitting for more than fifteen minutes at a time and, in conjunction with his knee pain, almost entirely prohibited him from standing and walking.  Tr. 106.  Hann testified that he was able to walk about one quarter of a mile before he would "get shooting pain down [his] hips and buttocks."  Tr. 108.  Hann then recounted a typical day in his life. Tr. 107.  He would wake up in the morning, feed his pets, and let them outside; this would usually take one to one and a half hours.  Tr. 107-08.  Afterwards, Hann needed to lie down and rest for approximately one hour.  Tr. 108.  During the day, Hann would do some housework, such as light sweeping, vacuuming, and dishes for approximately ten minutes at a time before he needed to rest due to back pain. Tr. 108, 113.  Hann would also take care of the pets every four hours, while periodically lying down throughout the day.  Tr. 108-09.  Hann testified that he drove twice a week at most; if he drove for more than fifteen miles his right leg and ankle would become symptomatic.  Tr. 116.

At Hann's second administrative hearing, he testified that his pain had become worse during the past two years, and it was becoming harder to sleep at night due to the pain.  Tr. 59.  Hann testified that his pain medications helped, but did not alleviate all of his pain.  Tr. 60.  Hann stated that, after walking or standing for too long, he would get a shooting pain down his legs, his legs would "get heavy," and he would start dragging his feet.  Tr. 62.  Hann testified that he could

only stand for ten minutes before the pain would force him to sit or lie down; he also needed to change positions every fifteen to twenty minutes on bad days because of pain and discomfort.  Tr. 62-63.  He experienced bad days approximately three times per week.  Tr. 64.

After Hann testified at the second administrative hearing, Paul Anderson, an impartial vocational expert, was called to give testimony.  Tr. 64.  The ALJ asked Mr. Anderson to assume a hypothetical individual with Hann's age, education, and work experience that was limited to light work,[13] but must be allowed to sit or stand at will during the workday.  Tr. 71.  The hypothetical individual would not be able to use pedals or levers with his lower right extremity, and must avoid climbing ropes, ladders, scaffolding, or poles.  Tr. 71-72.  The individual also could not stoop or crawl, but could occasionally climb stairs, kneel, crouch, or squat.  Id.  The hypothetical individual could occasionally reach overheard bilaterally, occasionally work with vibrating objects or surfaces, and occasionally work around fast-moving machinery.  Tr. 72.  The individual could not work in high, exposed places, and was limited to unskilled work.  Id.

---

[13] Light Work is defined by the regulations of the Social Security Administration as work "with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967.

Mr. Anderson opined that this hypothetical individual would not be able to perform any of Hann's past relevant work, but would be able to perform two jobs that exist in significant numbers in the national economy: an injection molding machine tender and an information clerk. Tr. 74. The ALJ then modified the hypothetical question. Id. The ALJ limited the hypothetical individual to sedentary work,[14] with all other limitations remaining in place. Tr. 74-75. Mr. Anderson testified that, given these restrictions, the individual could work as a label pinker in the textile industry or as a food and beverage order clerk. Tr. 75.

III.  **DISCUSSION**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). Substantial evidence has been described as

---

[14] Sedentary Work is defined by the regulations of the Social Security Administration as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967.

more than a mere scintilla of evidence but less than a preponderance.  <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Fed. Mar. Comm'n</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter v. Harris</u>, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims.  <u>See</u> 20 C.F.R. § 404.1520; <u>Poulos v. Comm'r of Soc.</u>

21

Sec., 474 F.3d 88, 91-92 (3d Cir. 2007).  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work, and (5) if not, whether he or she can perform other work in the national economy.  See 20 C.F.R. § 404.1520.  The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  Mason, 994 F.2d at 1064.

### A.    The ALJ's Credibility Determination

An ALJ's credibility determination is entitled to deference by the district court because "he or she has the opportunity at a hearing to assess a witness's demeanor."  Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).  Credibility determinations are only accorded such deference when there is a "sufficient basis" for that determination.  Izzo v. Comm'r of Soc. Sec., 186 F. App'x 280, 286 (3d Cir. 2006), (citing Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999)).  An ALJ's failure to evaluate or consider medically determinable

impairments will generally render a credibility determination defective.  See,

Jorich v. Colvin, 3:12-CV-01627, 2014 WL 2462963, at *9 (M.D. Pa. May 29,

2014); Arnold v. Colvin, 3:12-CV-02417, 2014 WL 940205, at *4 (M.D. Pa. Mar.

11, 2014); Gormont v. Astrue, 3:11-CV-02145, 2013 WL 791455, at *7 (M.D. Pa.

Mar. 4, 2013); Troshak v. Astrue, 4:11-CV-00872, 2012 WL 4472024, at *7 (M.D.

Pa. Sept. 26, 2012).

     In determining Hann's credibility, the ALJ failed to evaluate, or even

mention, several of Hann's medical diagnoses.  The record reflects that Hann had

been diagnosed with numerous impairments that the ALJ failed to mention,

including: lumbar spondylosis/osteoarthritis, degenerative joint disease of the

knees, a right foot stress fracture, right ankle peripheral neuropathy and

radiculopathy, peroneal tendinitis of the right foot, a lumbar disc herniation, and

right rotator cuff tendinitis.  Tr. 432, 521, 609, 683, 708, 713, 736.  This error

draws into question the ALJ's assessment of Hann's credibility.

     At step four of the sequential evaluation process, the ALJ found that Hann's

medically determinable impairments could reasonably cause his alleged symptoms

but that his statements concerning the intensity, persistence and limiting effects of

those symptoms were not credible.  Tr. 28.  The ALJ further found that, while

Hann's complaints of chronic pain were credible, his complaints and reported

limiting effects were excessive and not credible.  Id.  This determination by the

ALJ was based on an incomplete and faulty analysis of all of Hann's medically determinable impairments. Diagnoses such as lumbar spinal stenosis, a lumbar disc herniation, and degenerative joint disease of the knees buttressed Hann's complaints of pain and debilitating symptoms. In reaching her conclusion, the ALJ did not fully evaluate the record of these impairments. Furthermore, without discussion of this relevant evidence, it cannot be determined "if significant probative evidence was not credited or simply ignored." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).

The ALJ also cited Hann's application for unemployment benefits as a reason to discredit his complaints.[15] Tr. 29. An ALJ may properly use the receipt of employment benefits as a factor affecting a claimant's credibility. Myers v. Barnhart, 57 Fed. App'x 990, 997 (3d Cir. 2003). However, the receipt of employment benefits alone is not a sufficient reason to discount a claimant's credibility. See, id.; Russell-Harvey v. Colvin, 3:12-CV-00953, 2014 WL

---

[15] The Commissioner also argues that Hann's activities of daily living undermine his credibility. (Doc. 10). This was not relied upon by the ALJ, and therefore this Court cannot accept the Commissioner's post hoc rationalizations for the ALJ's decision. See, Fargnoli v. Massanari, 247 F.3d 34, 44 n.7 (3d Cir. 2001) (quoting SEC v. Chenery Corporation, 318 U.S. 80, 87 (1943)). In any event, the limited activities that the ALJ mentioned in her opinion (light household chores for no more than ten minutes at a time, feeding pets and letting them out of the house, and performing small household repairs) do not support a decision to discount Hann's credibility. Indeed, this Court has held that an ALJ's credibility determination was not supported by substantial evidence when the activities of daily living were more numerous and strenuous than those cited to in this case. See, e.g., Rider v. Apfel, 115 F.Supp.2d 496, 504-05 (M.D. Pa. 2000); Shedden v. Astrue, 4:10-CV-2525, 2012 WL 960632, at *10 (M.D. Pa. Mar. 7, 2012); Nicely v. Astrue, 4:10-CV-02412, 2012 WL 1231215, at *13 (M.D. Pa. Apr. 12, 2012).

2459681, at *12 (M.D. Pa. May 29, 2014); Aldrich v. Colvin, 3:13–CV–1292, 2014 WL 888507, at *13 (M.D. Pa. Mar. 6, 2014); Root v. Colvin, 1:13–CV– 00655, 2014 WL 1293833, at n.7 (M.D. Pa. Mar. 31, 2014).  In light of the ALJ's failure to properly evaluate the medical records, it appears that the application for unemployment benefits was afforded undue weight.  Without any other support for the ALJ's credibility determination, the request for unemployment benefits alone cannot support the ALJ's decision.  The ALJ's credibility determination was not supported by substantial evidence, and cannot stand.

### B.    Evaluation of Available Medical Evidence

Hann also argues that the ALJ improperly evaluated the available medical evidence in concluding that Hann maintained the residual functional capacity to perform light work.  Tr. 27.  Hann contends that limitations in his ability to stand and walk, along with limitations in his ability to lift and carry any weight greater than ten pounds, mandates a finding the he could only perform sedentary work. (Doc. 8).  Specifically, Hann argues that the ALJ improperly discounted the opinion of Hann's treating physician in favor of adopting Dr. Legaspi's opinion.

The preference for the treating physician's opinion has been recognized by the Third Circuit and by all of the federal circuits.  See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose

whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Id.  In choosing to reject the evaluation of a treating physician, an ALJ may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence.  Id.

The ALJ rejected Dr. Yurek's opinion for two reasons: first, the opinion was "inconsistent with the record," and second, Dr. Yurek's office provided a letter to the unemployment office in 2006 stating that Hann could work with restrictions (the "Letter").  Tr. 29.  The ALJ stated that "the undersigned is wary of a medical provider who provides a letter that the claimant can work with restrictions to the unemployment office and but [sic] asserts he is completely unable to work to Social Security [sic]."  Id.

The decision of the ALJ to discount Dr. Yurek's opinion because of his earlier representation that Hann could work with restrictions finds no support in the record.  There was a two year time difference between the drafting of the Letter and Dr. Yurek's opinion that Hann was completely disabled.  Tr. 588, 758.  The Letter was written in April 2006, at a time that Hann was receiving epidural injections that were initially successful in ameliorating Hann's pain.  Tr. 428, 588.  At a March 29, 2006 appointment with Dr. Malinowski, less than two weeks prior to the Letter being written, Hann reported that an epidural injection had reduced

26

his pain significantly.  Tr. 432.  Hann received a second epidural injection on April 12, 2006; this injection reduced Hann's pain to zero at rest, and four with activity. Tr. 430.  Hann was also able to increase his activities of daily living to seventy percent of their pre-injury level.  Id.  Thus, at the time Dr. Yurek office drafted the Letter, it was not inconceivable that Hann could return to work at a reduced capacity.

In contrast, when Dr. Yurek opined in April 2008 that Hann was totally disabled, Hann was no longer receiving epidural injections.  Tr. 750-59.  Dr. Yurek noted that the epidural injections "seemed to help at first, but no total relief was seen."  Tr. 759.  When Hann presented for one of his last appointments with Dr. Malinowski in November 2006, his pain level had already increased to a four at rest and seven with activity.  Tr. 683.  Hann also testified that his condition had progressively deteriorated between 2005 and 2008, and his pain had gradually increased during that time.  Tr. 59, 105-06.  At the time Dr. Yurek opined that Hann was disabled, he acknowledged that his office had previously stated that Hann could work with restrictions.  Tr. 759.  Consequently, it appears that Hann's condition steadily deteriorated between 2006 and 2008.  Therefore, it was not

necessarily disingenuous of the office to opine that Hann could work in 2006, but was disabled by 2008.[16]

The decision of the ALJ to discount Dr. Yurek's opinion, as "inconsistent with the record," is also unsupported.  Because the ALJ failed to identify any evidence that she relied upon in determining that Dr. Yurek's opinion was inconsistent with the record, this Court is unable to meaningfully review the ALJ's determination.  As detailed previously, the ALJ omitted any discussion or mention of numerous medical reports and diagnoses.  Tr. 432, 521, 609, 683, 708, 713, 736. This evidence, such as evidence of degenerative joint disease of the knees and a lumbar disc herniation, was certainly not inconsistent with Dr. Yurek's findings, and may well have supported his findings had the ALJ considered this evidence. Consequently, the ALJ's decision to afford little weight to Dr. Yurek's opinion was not supported by substantial evidence.  See, e.g., Minner v. Astrue, 741 F. Supp. 2d 591, 603 (D. Del. 2010); Brown v. Astrue, 852 F. Supp. 2d 543, 556 (D. Del. 2012); Maellaro v. Colvin, 3:12-CV-01560, 2014 WL 2770717, at *10 (M.D. Pa. June 18, 2014).

The ALJ also failed to adequately explain why she gave greater weight to the opinion of Dr. Legaspi, a non-examining state agency physician, than to every

---

[16] Strangely, while the ALJ discounted Dr. Yurek's opinion at least partially because it conflicted with the opinion provided by Ms. Oney in the Letter, the ALJ afforded the opinion contained in the Letter "great weight."  Tr. 29.  Either the "inconsistencies" in the opinions from the same medical provider diminished the weight of both opinions, or diminished the weight of neither opinion.

other medical opinion contained within the administrative record.  The ALJ

assigned the greatest weight to Dr. Legaspi, reasoning that her opinion was "more

consistent with the record" than any other opinion, and she "had a good

longitudinal picture of the case."  Tr. 29.  However, the ALJ failed to account for

numerous opinions, diagnostic tests, and medical records that were inconsistent

with Dr. Legaspi's opinion.

For example, no other relevant medical opinion was consistent with Dr.

Legaspi's opinion that Hann was capable of light work.  Tr. 761.  Dr. Holencik and

Dr. Dixon both opined that Hann should be limited to sedentary work, while Dr.

Yurek believed that Hann was not even capable of sedentary work.  Tr. 58, 746,

752.  The ALJ did not reconcile the fact that Dr. Legaspi did not find degenerative

disc disease and neuropathy of the lumbar spine to be medically determinable

impairments, despite the fact that Dr. Dixon, believed that these were medically

determinable impairments.[17]  Tr. 44.  The ALJ also failed to account for the fact

that Dr. Legaspi believed that Hann was not taking narcotic medications when

even a cursory review of the medical records reveals numerous prescriptions for

narcotic medications.  Tr. 428, 436, 443, 454, 675, 676, 677, 678, 686, 689, 694.

Consequently, the ALJ's decision to reject the opinion of Dr. Yurek and

instead adopt the opinion of Dr. Legaspi was not supported by substantial

---

[17] Importantly, the ALJ gave Dr. Dixon's opinion "great weight." Tr. 29.

29

evidence.  As a result, the ALJ's decision that Hann was capable of performing

light work was likewise flawed.

### C.    The Errors Were Not Harmless

Hann argues that the ALJ's errors are critical because, under most medical

opinions rendered in this case, Hann had the capacity to perform sedentary work or

no work at all.  (Doc. 8).  This is important because Hann was "approaching

advanced age" with limited education; therefore, if Hann were limited to sedentary

work, under the social security Medical-Vocational guidelines (the "Grids") he

would be disabled.[18]  See, 20 C.F.R. pt. 404, subpt. P, app. 2, Rule 201.10.

In contrast, the Commissioner argues that reliance on social security rules

would be inappropriate since Hann had both exertional and nonexertional

limitations.  (Doc. 10).  Thus, in the Commissioner's view, an error would be

rendered harmless by virtue of the vocational expert's testimony.  Tr. 75.

The aforementioned errors are not made harmless by virtue of the vocational

expert's testimony at the second administrative hearing.  While it is true that the

Commissioner may not rely exclusively on the Grids to find a claimant not

disabled when the claimant has non-exertional limitations, the inverse is not true.

Where the Grids would direct a finding of disability, the ALJ must find the

---

[18] Hann did have some semi-skilled past relevant work and thus, if the ALJ had found that Hann had some transferrable skills, he would not be disabled. 20 C.F.R. pt. 404, subpt. P, app. 2, Rule 201.10. However, the ALJ did not address whether Hann possessed transferrable skills.  Tr. 30.

claimant disabled.  See, Sykes v. Apfel, 228 F.3d 259, 269 (3d Cir. 2000) ("where an individual has an impairment . . . resulting in both exertional and nonexertional limitations, if a finding of disability is not possible based on exertional limitations alone, the grids provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations.") (internal quotations omitted).  See also, Prinkey v. Astrue, CIV.A. 11-65J, 2012 WL 4596184, at *5 (W.D. Pa. Oct. 1, 2012); Mac v. Sullivan, 811 F.Supp. 194, 198 (E.D. Pa. 1993); LaMacchia v. Barnhart, 351 F.Supp.2d 304, 309-10 (E.D. Pa. 2004); Owens v. Bowen, No. 83-4328, 1988 WL 252065, at *3 (D.N.J. Apr. 29, 1988).

The Grids establish the existence of jobs in the national economy for individuals with exertional limitations only; the Third Circuit has recognized that nonexertional limitations further erode this job base, thus making the Grids unreliable in finding that an individual with nonexertional limitations is not disabled.  Sykes, 228 F.3d at 266-71.  It would be illogical for social security rules to mandate a finding that a claimant is disabled based solely on exertional limitations, but allow an ALJ to find a claimant not disabled when exertional limitations are coupled with nonexertional limitations.

IV.    **CONCLUSION**

A review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An order consistent with this memorandum follows.


BY THE COURT:

s/Yvette Kane
Yvette Kane
United States District Judge

Dated: September 26, 2014